**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| SCHARLENE BROOKS, Individually and on behalf of all others similarly situated, | CASE No. _____ |
| Plaintiff, | |
| vs. | |
| UNITED DEVELOPMENT FUNDING III, UMT SERVICES, INC., UMTH GENERAL SERVICES, L.P., UMTH LAND DEVELOPMENT, L.P., UMT HOLDINGS, L.P., HOLLIS M. GREENLAW, TODD ETTER, CARA D. OBERT, BEN L. WISSINK, WHITLEY PENN LLP | **CLASS ACTION COMPLAINT**<br><br>**JURY DEMAND** |
| Defendants. | |

Scharlene Brooks ("Plaintiff"), by and through undersigned counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon, among other things, counsel's investigation, which includes without limitation:  (a) review and analysis of regulatory filings made by United Development Funding III ("UDF III") and other United Development Fund-sponsored investment programs (collectively "UDF Programs") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by UDF III, UDF IV and other UDF Programs; (c) media reports concerning UDF III, and other UDF Programs; and (d) review of the SEC Complaint against UDF III and UDF IV which was settled in July 2018 and other publicly available information and lawsuits concerning UDF IV, UDF V and the UDF Programs.

Plaintiff brings this class action under Rule 23(b)(2) and/or (b)(3) Fed. R. Civ. P. and the

Texas Securities Act and the common law on behalf of all persons or entities who purchased

UDF III units in its Dividend Reinvestment Plan ("DRIP"), from January, 2011 through the

present, (the "Class Period.")  UDF III was never listed on any exchange and is thus not subject

to the Securities Litigation Uniform Standards Act.

## I.     NATURE AND SUMMARY OF THE ACTION

1.     This action arises out of the third in a series of investment offerings known as

United Development Funds, all of which have essentially failed.  In July 2018, a complaint filed

by the Securities Exchange Commission revealed for the first time what had been speculated

since February 2016, that UDF III's reported financial and operational success in investing in

and lending for real estate development projects (upon which UDF III's dividend payments

depended) was false.  The SEC made public a scheme whereby UDF III was receiving funds

from subsequent UDF investment vehicles, *i.e.* UDF IV and UDF V, to allow UDF III to pay

distributions. Accordingly, Plaintiff and class members were duped into foregoing the receipt of

cash distributions from UDF III and using those distributions to purchase UDF III units in the

Dividend Reinvestment Plan ("DRIP").

2.     The United Development Funding family of investment funds raised investor

capital in the UDF III offering with the implied and express representation that investors' capital

would be used to finance home builders and land developers and earn a return on loans to

builders and developers which would allow UDF III to pay distributions to Plaintiff and class

members.  However, as it was later revealed by the SEC, the UDF Defendants[1], aided and

abetted by Whitley Penn LLP, used money from investors in UDF IV and V to prop up UDF III

---

[1]        The UDF Entity Defendants are United Development Funding III, UMT Services, Inc., UMTH General Services, L.P., UMTH Land Development, L.P.  UDF Individual Defendants are UMT Holdings, L.P., together with Hollis M. Greenlaw, Todd Etter, Cara D. Obert and Ben L. Wissink (the "Individual Defendants") (both groups collectively sometimes referred to as "UDF Defendants").

without disclosing same to Plaintiff and class members.  Defendants thereby created the

appearance that UDF III was a successful, productive investment for Plaintiff and other class

members who were induced to reinvest their distributions into more UDF III units through the

DRIP rather than take the distributions in cash.  The scheme allowed UDF to funnel cash to the

UDF Entity Defendants while giving Plaintiff and class members overvalued units in lieu of cash

dividends.

        3.       UDF III solicited investments in UDF III (and subsequent series of investment

funds, UDF IV, UDF V) by stating the ability to generate 8% to 9.75% annualized returns and to

pay investors regular distributions.  UDF III began offering limited partnership interests in 2006

and raised approximately $350 million from private investors.  Building on a deceptive track

record of purportedly paying regular distributions to UDF III investors with cash generated by its

own allegedly legitimate operations, UDF launched UDF IV in 2008 and raised over $610

million from investors through May 2013.

        4.       From at least January 2011 through July 2018, UDF III concealed that is was

using money from UDF IV and UDF V to pay distributions to investors in UDF III, without

adequately disclosing the sources and uses of funds, the financial condition of UDF III or its true

operating results or the fact that UDF III's loan portfolio was overly concentrated with loans to

borrowers in violation of relevant partnership agreements and was misrepresenting the nature

and status of those loans.

        5.       The UDF III prospectus and registration statement pursuant to which the DRIP

units were issued and periodic filings with the SEC during the Class Period omitted any

disclosure of the following facts:  (i) UDF III loans were being paid down with monies raised by

UDF IV and UDF V and loaned by those entities UDF IV to UDF III borrowers who were then

directed to use funds they borrowed from UDF IV and UDF V to pay loans they owed to UDF III; (ii) UDF III failed to disclose that from 2011 through 2015 it was exceeding loan limit restrictions set forth in its Partnership Agreement; (iii) UDF III failed to disclose that its loans were invested in unimproved real property and falsely implied that all UDF III loans were funding projects under construction; and (iv) UDF III failed to disclose at least as early as end of 2013 that approximately $80 million in loans to one of UDF III's largest borrowers was impaired.

6.     Like traditional Ponzi schemes, the UDF III and the UDF Defendants always needed more cash to sustain-their scheme.  And to raise money they had to demonstrate past success.  So they mislead UDF III investors to believe that UDF III was operating profitably, getting repaid on its loans and funding dividends as represented in its statement to unitholders.

7.     UDF III and its general partner, UMTH Land Development L.P. owed fiduciary duties to Plaintiff and the class because class members were limited partner in a partnership with UDF III and UMTH Land Development L.P., the general partner.

8.     The UDF Defendants and Whitley Penn herein participated and assisted in, and/or facilitated UDF III's scheme.  In particular, independent public accountant, defendant Whitley Penn LLP, audited not only the ,financial statements of UDF I, UDF III, UDF IV and UDF V, but also those of affiliated entities whose investors and creditors benefitted directly and indirectly from UDF III, IV and-UDF V capital.  Whitley Penn certified UDF III's annual financial statements and provided materially false and misleading audit opinions that UDF III's financial statements were "fairly presented" in conformity with GAAP during the entire Class Period.

9.      Since the fact and extent of UDF III's scheme and misstatements and omissions became known, the UDF III shares are now worth only a fraction of the $20.00 per share value at which DRIP shares were sold to Plaintiff and the Class.  UDF III admits that the general partner has not determined an estimated value of the units since March 2015.

## II.      JURISDICTION AND VENUE

10.     Defendant UDF III, has a principal place of business in Grapevine, Tarrant County, Texas, which is located in this judicial district.  Venue is therefore proper in this District.

11.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332, because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs, and on information and belief, between 1/3 and 2/3 of UDF III shareholders are residents of states other than Texas.

## III.     PARTIES

### a.      Plaintiff

12.     Plaintiff Scharlene Brooks is a resident of Houston, Texas.  She purchased UDF III shares in the DRIP during the Class Period.

### b.      Defendants

#### 1.      UDF III

13.     Defendant UDF III is a Delaware Limited Partnership formed in 2005, with its principal executive offices located at 1301 Municipal Way, Suite 100, Grapevine, Texas 76051. It sold DRIP shares to Plaintiff and the Class during the Class Period and used materially false and misleading Registration Statement, Prospectus, annual and quarterly financial reports and

communications to unitholders to do so.

### 2. UDF Entity Defendants

14.     UMTH Land Development, L.P. ("UMTHLD") is a Delaware limited partnership formed in 2003 that is the general partner of UDF III.  UMTHLD participates in the control and management of UDF III's daily operations and business.  As a general partner of UDF III it owes a fiduciary duty to UDF III and its limited partners.  It has also been the asset manager for UDF I, II and IV and was thus aware of, and responsible for the misconduct occurring at those entities.

15.     Defendant UMT Services, Inc. ("UMTS"), is the General Partner of Defendant UMTHLD and also general partner of UMT Holdings, L.P. (which is a limited partner of UMTHLD) and is the general partner of Defendant UMTH General Services, L.P.  Greenlaw is its CEO and 50% owner and Defendant Etter is its Chairman and 50% owner.

16.     Defendant UMT Holdings, L.P. ("UMTH") is the Limited Partner (Delaware) for both Defendant UMTH General Services, L.P. and Defendant UMTHLD.  UMTH holds 99.9% of limited partnership interests in UMTHLD.  UMTH also served as UDF IV's asset manager during the UDF IV Class Period. Its role was to "identify and underwrite real estate professionals in each region or, in some cases, each sub-market in which [UDF IV] invest[ed], and... utilize these proprietary strategic partner relationships to actively manage each loan or investment."

17.     Defendant UMTH General Services, L.P. ("UMTHGS") is a Delaware Limited Partnership which assists defendant UMTHLD in managing UDF III.  UMTHGS is General Partner of Defendant UDF IV and its "advisor."

18.     The UDF Entity Defendants shared a common group of equity holders, directors, officers and executives *(i.e.,* the UDF Individual Defendants, defined *infra),* headed in particular (but not solely) by Defendants Greenlaw, Etter and Obert.  As alleged more fully herein, the

UDF Entity Defendants were individually and collectively instrumental in the creation of UDF III's false and misleading prospectus and SEC filings as detailed herein and orchestrated the scheme described herein.

**The UDF Individual Defendants**

19.     Defendant Hollis M. Greenlaw ("Greenlaw") was, at all relevant times during the Class Period, the Chief Executive Officer UDF III, of UMTHLD and CEO and Chairman of the Board of Trustees for UDF IV and UDF V.  Greenlaw signed the UDF III Registration Statement as well as numerous additional SEC filings.  Greenlaw is one of three Voting Investment Committee members of UMTHLD.  Greenlaw owns 32.83% of UMTH, 50% of UMT services, 50% of United Development Funding II, Inc.

20.     Defendant Todd Etter ("Etter") was, at all relevant times the Executive Vice President of UMTHLD, Director and Chairman of UMTS, its general partner, and Chairman of UMTH.  Etter is one of three Voting Investment Committee members of UMTHLD and is on the UDF IV Investment Committee.  He is listed among "key personal" of UDF IV.  Etter owns 50% of UMT Services and 30% of UMTH.

21.     Defendant Cara D. Obert ("Obert") was, at all relevant times during the Class Periods, CFO of UMTHLD, and CFO and Treasurer of both UDF I and II and IV and treasurer of UDFX, Inc.  Obert owns 4.82% of UMTH.  From 2008 through 2017 she was UDF III's principal financial officer and principal accounting officer.  She signed numerous SEC filings for UDF III and UDF IV.  She is a CPA and is identified as UDF IV "Key Personnel."

22.     Defendant Ben L. Wissink ("Wissink") is the President of UMTHLD, as well as COO of UMTS.  He is a partner of UMTH owning 10.09%.  He served on the UMTHLD Investment Committee.  Wissink is listed among "Key Personnel" of UDF IV.  According to

UDF IV's website, Wissink has been involved with UDF since 2005 and was personally involved in the management of UDF loans at UDF I, II and III.

23.      Defendants Greenlaw, Etter, Obert and Wissink, (the "UDF Individual Defendants"), because of their positions at UDF III and/or their senior positions with numerous other UDF affiliates, possessed the power and authority to control and did control the content and form of UDF III prospectuses, annual reports, quarterly reports, press releases and other materials provided to the SEC, securities analysts, money and portfolio managers and investors. The UDF Individual Defendants authorized the publication of the documents and materials alleged herein to be misleading prior to their issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their positions with UDF III, and/or their senior positions with numerous UDF affiliates, they had access to material non-public information, and they knew, or recklessly or negligently failed to know, that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading.

**Defendant Whitley Penn**

24.      Defendant Whitley Penn, LLP served as UDF III's, UDF IV's and UDF V's independent public accountant throughout the Class Period and served as the independent public accountant for United Mortgage Trust ("UMT"), all of which share a management team and are located in the same principal place of business.  Because it served as the independent public accountant for numerous UDF III, UDF IV and UDF V affiliates, Defendant Whitley Penn was uniquely privy to related-party transactions that involved UDF III, UDF IV, UDF V, their affiliates and their officers and trustees.  Defendant Whitley Penn was in a unique position to be aware of undisclosed exposure to Centurion across the entire UDF family of funds and entities.

It was also in a unique position to be aware of the material misstatements and omissions in UDF III's SEC filings.  Even while knowing about the above perceived omissions, improprieties and risks, Whitley Penn allowed and assisted the UDF Defendants in disseminating false and misleading statements to investors.

## CLASS ACTION ALLEGATIONS

25.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3) on behalf of a class consisting of individuals and/or entities who purchased or otherwise acquired UDF III securities in the Secondary DRIP from January 1, 2011 and the present, inclusive (the "Class Period") and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

26.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, UDF III units were issued by UDF for the Secondary DRIP at the price of $20.00 per unit.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class.  As of the present, UDF III issued over 2 million units in its secondary DRIP available to UDF III's approximately 9,000 unitholders during the Class Period.  Members of the Class may be identified from records maintained by UDF III and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

27.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

28.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

29.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        (a)     whether the state securities laws were violated by Defendants' acts as alleged herein;

        (b)     whether Defendants breached fiduciary duties owed to Plaintiff and class members;

        (c)     whether statements made by Defendants to the Plaintiff and class members during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of UDF III;

        (d)     whether Whitley Penn falsely or recklessly provided materially misleading audit opinions for UFD III's annual financial statements during the Class Period;

        (e)     to what extent the members of the Class have sustained damages and the proper measure of damages; and

        (f)     whether Plaintiff and class members are entitled to rescission with respect to all Secondary DRIP purchases during the Class Period.

30.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation makes it impossible for members of the Class to individually

redress the wrongs done to them.  There will be no difficulty in the management of this action as

a class action.

## FACTUAL ALLEGATIONS

### A.  The UDF Funds

31.     Greenlaw and Etter founded UDF in 2003 with the aim of starting one or more

investment funds to loan money to developers of residential real estate, with rates above those

offered by commercial lenders.  Over time, UDF established a family of investment funds (*i.e.,*

UDF I, II, III, IV and V) that each raised money from investors.  UDF III represented that the

fund would strive to make a 8% to 9.75% annualized return for investors based on the ability of

the fund's borrowers to successfully develop real estate and repay their loans.  UDF explained

UDF III as being appropriate for investors seeking "current interest income."

32.     UDF III has no employees and depends upon Defendant UMTHLD, its general

partner for "overall management, conduct and operation" of VDF III.  UMTHLD had "authority

to act on [UDF III's] behalf in all matters. . ."  In addition, according to repetitive disclosures in

the UDF Annual Reports on Form 10Ks ("10Ks") issued during the Class Period:

> Our general partner will make all decisions with respect to our
> management and determine all of our major policies, including our
> financing, growth investment strategies and distributions.

33.     UDF III explained that it expected to earn investment returns by originating and

purchasing loans as well as charging fees for providing credit enhancements to developers (*e.g.*,

loan guarantees to third-party lenders).  It would make short to medium-term loans to real estate

developers at interest rates of 15% and above, which was higher than traditional bank financing.

11

Under the loan agreements, the developers would pledge existing real estate projects as collateral, and agree to pledge future projects as additional collateral, when needed.

34.     In August 2005, UDF filed a Form S-11 with the SEC to offer investments in a third fund, UDF III.  UDF III represented that it was formed to originate and invest in loans for the acquisition of real property to be developed as single-family residential lots that would be sold to home builders.  UDF III is a publicly-reporting, non-traded fund.  The minimum investment for UDF III, however, was only $3,000, and the fund was offered by a much broader network of broker-dealers than the prior funds.

35.     UDF III generally structured its loans as notes with interest payments and reductions to principal or "balloon payments" tied to cash received by the developer from the sale of a lot or parcel of land, municipal reimbursements, and refinancing.  From inception of the note until a revenue or sale event, interest on the notes would accrue and then be rolled into the periodic payments of principal and interest owed by the developer on a monthly or annual basis with the accrued interest amount being recognized by UDF III as income.

36.     On May 15, 2006, UDF III commenced its initial public offering covering up to 12,500,000 LP Units (the "Primary Offering"),  and up to 5,000,000 LP Units to be issued pursuant to the distribution reinvestment  plan (the "First DRIP").  The offering price through the Primary Offering and the First DRIP was $20.00 per LP Unit.  The Primary Offering was terminated on April 23, 2009 and the First DRIP was terminated on July 21, 2009.  UDF III sold 16,499,994 LP Units pursuant to the Primary Offering in exchange for gross proceeds of approximately $330.3 million (approximately $290.7 million, net of costs associated with the Primary Offering). UDF III issued 716,260 LP Units pursuant to the First DRIP in exchange for gross proceeds of approximately $14.3 million.  UDF III concluded its Primary Offering in April

2009, raising approximately $350 million, which was 10 times the amount raised in its two prior funds combined.

37.     On June 12, 2009, UDF III registered 5,000,000 additional units to be offered through the secondary dividend reinvestment program ("Secondary DRIP") at the same $20.00 estimated unit value as the initial DRIP.  As of September 30, 2015, UDF III had issued 3,290,286 LP Units through the Secondary DRIP at the same $20 per unit in exchange for gross proceeds of approximately $65.8 million (the "Second DRIP").

38.     During the Class Period, UDF III sold the following quantities of units in the Secondary DRIP to Plaintiff and class members:

| | | |
|---|---|---|
| 2011 | $10.8 million | 500,000 units |
| 2012 | $10.4 million | 500,000 units |
| 2013 | $10.7 million | 500,000 units |
| 2014 | $9.7 million | 485,000 units |
| 2015 | $7.1 million | 355,000 units |

39.     During the Class Period, in the Secondary DRIP UDF III sold to Plaintiff and class members approximately 2.35 million units, reflecting proceeds of approximately $48 million.

**B.      UDF III's SEC Filings**

40.     On June 12, 2009 UDF III filed with the SEC a Form S-3 Registration Statement for 5,000,000 units at an offering price of $20.00 per unit to be sold to existing unit holders, Plaintiff and class members, through the "Amended and Restated Distribution Reinvestment Plan."

13

41.     The Registration Statement was signed by Defendants Greenlaw, Obert and Etter

on June 12, 2009.

42.     The Registration Statement included a prospectus which was effective for the

entire class period and never amended, supplemented, modified or corrected.

43.     In the Prospectus, unitholders were advised:

> There is no public trading market for our units, and there can be no
> assurance that a market will develop in the future.  The units may
> be purchased under the DRP at $20.00 per unit.  Our general
> partners arbitrarily determined the selling price of the units to be
> issued under the DRP, and such price bears no relationship to our
> book or asset values, or to any other established criteria for valuing
> issued or outstanding units.  The selling price may not be
> indicative of the price at which the units may trade if they were
> listed on an exchange or of the proceeds that a limited partner may
> receive if we liquidated or dissolved.

44.     The prospectus also indicated that "later information filed with the SEC will

update and supersede this information" and "any future filings made with the SEC under

Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 until the DRIP is

terminated comprise the incorporated documents."  [Emphasis supplied].  Accordingly, all of

UDF III's Form 10-Ks, Forms 10-Qs and 8-Ks and Proxy Statements filed with the SEC during

the Class Period were "incorporated by reference" into the Prospectus which remained effective

for every DRIP sale to Plaintiff and class members during the Class Period.  "Future filings"

including UDF III's 2011, 2012, 2013 and 2014 represented that Defendant "Land Development,

our general partner approved an estimated value of our units of limited partnership interest equal

to $20.00 per share.  The Individual Defendants signed their 10-Ks.

45.     The Prospectus did not describe or warn of any "Risk Factors" except to direct

class members to the "Risk Factors" section in "our most recent Annual Report on Form 10-K

and . . . Quarterly Reports on Form 10-Q."  The "Risks Factors" did not disclose any intention or

possibility or risk that:  (i) UDF III would need its successor funds (UDF IV and V) to make

loans to UDF III borrowers so those borrowers could pay their UDF III loans; (ii) the risk that

UDF III borrowers would be allowed by UDF III to forebear for years from developing the

properties which secured loans from UDF III; and (iii) the risk that UDF III would or could

violate its Partnership Agreement's restrictions on concentration of loans.

46.     The Prospectus (and later 10Ks issued during the Class Period) purported to

inform DRIP purchasers of the use of proceeds raised under the DRIP plan:

> The proceeds raised pursuant to the DRIP will be used for general
> partnership purposes, including, but not limited to, originating,
> purchasing, participating in and holding for investment mortgage
> loans making other investments in real estate, payments of fees and
> other costs, repayment of debt, and funding for our unit redemption
> program.

47.     However there was no disclosure that UDF III was, or would be, using is funds to

repay loans made by UDF I and/or other UDF affiliates to borrowers who are/would be unable to

stay current on payments to UDF I or other UDF affiliates.

48.     The Secondary DRIP was commenced on July 21, 2009 and continued through

the Class Period and the Registration Statement and Prospectus referred to above remained

effective for that entire time.

49.     During the Class Period Defendant General Partner owed fiduciary duties of

loyalty and due care to Plaintiff and class members who were limited partners.

50.     In the Prospectus and in each annual report on Form 10-K during the Class

Period, UDF III detailed its "Principal Investment Objectives."

- to make, originate or acquire a participation interest in
  mortgage loans (first priority and junior priority) typically

in the range of $500,000 to $10,000,000, and to provide credit enhancements to real estate developers and regional and national homebuilders who acquire real property, subdivide such real property into single-family residential lots and sell such lots to homebuilders or build homes on such lots;

- to produce net interest income from the interest on mortgage loans that we originate or purchase or in which we acquire a participation interest;

- to produce a profitable fee from our credit enhancement transactions;

- to produce income through origination fees charged to borrowers;

- to maximize distributable cash to investors; and

- to preserve, protect and return capital contributions.

We derive a substantial portion of our income by originating, purchasing, participating in and holding for investment mortgage loans made directly by us or indirectly through our affiliates to persons and entities for the acquisition and development of parcels of real property as single-family residential lots that will be marketed and sold to home builders. We may also offer credit enhancements to developers in the form of loan guarantees to third-party lenders, letters of credit issued for the benefit of third-party lenders and similar credit enhancements.

51.     UDF III failed to disclose that it would, or could, cause UDF III borrowers to take loans from UDF IV and/or UDF V so said borrows could repay loans owned to UDF III.

52.     UDF III disclosed in its prospectus that from time to time it "may borrow funds or use net proceeds from this offering… if we do not have cash available for distribution sufficient to cover taxes on any 'phantom income' to our limited partners." UDF III also disclosed that "we may fund our distributions from borrowings and the amount of distributions paid at any time may not reflect current cash flow from our investments." But nowhere did UDF III state that it

16

could use funds from an affiliated fund (*e.g.,* UDF I, UDF IV) to pay distributions to UDF III investors.

53.     UDP III's SEC filings during the Class Period have described its business purpose as follows:

> Our principal purpose is to originate, acquire, service, and otherwise manage, either alone or in association with others, a diversified portfolio of mortgage loans on real property (including mortgage loans that are not first in priority, participation interests in mortgage loans, and mezzanine loans) and to issue or acquire an interest in credit enhancements, such as guarantees or letters of credit.
>
> We intend to seek to make or acquire loans primarily with respect to projects where the completed subdivision will consist of homes at or below the median price of the U.S. housing market.

54.     UDF III disclosed that its intent was to redeploy borrowers' principal repayments "to create or invest in new loans during the term of the partnership" and that "[a]ny capital not reinvested will be used first to return to [investors'] capital contributions and then to pay distributions to [investors]."  This meant that: (1) UDF III planned to loan to real estate developers the fund invested by Plaintiff and class members; (2) when those developers repaid principal on their loans, UDF III would reinvest those funds in new loans; and (3) UDF III was not obligated to make investor distributions, but if it did, that money would come from cash flow from operations, borrowings, or net proceeds of offerings, but not principal repayments from UDF borrowers.

55.     UDF III's 10Ks stated informed investors "developers to whom we make loans and with whom we enter into subordinate debt positions will use the proceeds of our loans and investments to develop raw real estate into residential home lots.  The developers obtain money to repay our development loans by reselling the residential home lots to home builders or

individuals who build a single-family residence on the lot.  The developer's ability to repay our

loans is based primarily on the amount of money generated by the developer's sale of its

inventory of single family residential lots."

56.     UDF III failed to disclose that UDF III development loans could and would be

repaid from said developments loans obtained from UDF IV and/or UDF V.

     **C.**     **UDF III Faces A Liquidity Crisis Which It "Solved" Through
Implementation Of The "Scheme" Described Herein**

57.     By 2008, the various UDF funds were struggling under the weight of the

declining real estate market.  UBF III was experiencing a liquidity crisis.  By July 8, 2009, UDF

III's cash levels were so low that it severely limited its investors' rights to redeem their

investments.  That September, to obtain desperately needed cash, UDF III paid a large

origination fee and pledged all of its assets as security for a $15 million line of credit. UDF III

then immediately exhausted this entire line of credit.

58.     UDF III had made substantial loans to developers and was making monthly

distributions to investors in amounts that at times exceeded developer interest payments during

the same period.

59.     By 2011, UDF III, at times, did not have sufficient monthly cash flow to cover its

distributions. UDF III investors had come to expect regular monthly income from distributions

and did not want to have to pay taxes on phantom income.  Also, UDF had begun offering

interests in its newest fund, UDF IV.  Because UDF emphasized UDF III's regular distributions

in its prior performance disclosures to prospective investors in UDF IV, any suspension or

stoppage in distributions could harm its ability to raise investor funds.  UDF IV was raising

money in its offering that it needed to put to work; not only to generate interest income to fund

18

distributions to its investors, but also to generate origination and asset management fees for UDF operations—a portion of which were ultimately distributed to principals of the fund's advisor—and were tied to when money was loaned out on projects.

60.     But UDF III needed to conserve cash as much as possible and therefore in 2009, UDF III initiated the Secondary DRIP in order to avoid as much as possible paying distributions in cash.

61.     UDF III's cash deficits motivated the scheme described below.  According to the SEC, UDF funded UDF III distributions in part by having UDF IV make secured real estate loans to UDF IV developers who used the proceeds to pay down their previous loans from UDF III.  Those developers did not use the new UDF IV money to advance the underlying UDF IV development projects, but instead—*at UDF's direction*—used it to pay down interest and principal on the developers' outstanding loans from UDF III.  UDF III then used the funds it received from the borrowers to make distributions to UDF III investors.

62.     According to the SEC, the developers involved did not object because their total outstanding indebtedness to "UDF" remained the same, and in many instances their cost of borrowing went down, because UDF IV loaned funds at a lower rate than UDF III.  In fact, many times the borrower never touched the money from UDF IV.

63.     According to the SEC, UDF's reporting of these transfers created the appearance that UDF III was receiving enough money from operations on a monthly basis to support its ongoing distributions, and that UDF IV had sufficient borrower demand for its money to justify continuing to raise more.  Money advanced by UDF IV was reflected in UDF IV's disclosures as an increase in a specific loan's carrying balance, but at times was not used to advance the construction of the project.  The pay down of UDF III loans with UDF IV money reduced the

19

carrying amount of UDF III's loan portfolio and created a misleading appearance of successful

development investments by UDF III. UDF III's disclosures reflected the repayment of loans,

recognized income, and the timely payment of distributions; while UDF IV's disclosures showed

developers borrowing increasing amounts related to specific real estate projects. UDF III's

financial statements issued during the Class Period were materially false and misleading in this

regard.

64.     According to the SEC, the amounts involved were substantial. From at least

January 2011 through December 31, 2015, UDF III received including approximately $80

million from UDF IV and used almost all of it to pay UDF III investors monthly distribution

payments, of which at least $67 million came from UDF IV.

65.     According to the SEC, each of the UDF IV-to-UDF III transfers exhibited similar

characteristics. Each month UDF received an email from an outside vendor detailing how much

money was needed to make distributions to investors. UDF, which monitored daily cash flows

and bank balances among all UDF entities, then determined the UDF III cash requirements to

fund the investor distributions. When UDF III had insufficient cash on hand, UDF sent an

internal email directing a transfer of funds available from UDF IV to UDF III. Once the transfer

from UDF IV to UDF III was complete, instructions were sent to the accounting department

directing a distribution to UDF III investors. Further, although UDF eventually obtained

approval from the borrower for these transactions, and the transfer from UDF IV was permitted

pursuant to certain transaction agreements, it was the lender (*i.e.*, UDF) and not the borrower that

initiated the transactions. As discussed above, in many instances, the borrower never even

touched the money from UDF IV.

66. According to the SEC, UDF did not disclose the true nature of the transactions giving rise to the distributions to its investors. To the contrary, UDF III investors were led to believe that their distributions were being paid from the operations of their fund, while UDF IV investors were led to believe that their investments were being deployed towards active real estate projects. Relying in part on these UDF IV-to-UDF III transfers, UDF III made a monthly distribution payment to UDF III investors each month until February 2016. Thereafter, all distributions stopped.

67. UDF III's Registration Statement and Prospectus for the Secondary DRIP, UDF III's and UDF IV's annual reports on Forms 10-K, for at least the periods ended December 31, 2010 through December 31, 2014, and quarterly filings on Forms 10-Q for the periods ended September 30, 2010 through December 31, 2015, failed to adequately disclose the source of funds for UDF III's distributions to investors, and UDF III failed to adequately disclose the use of UDF IV funds to pay down UDF III loans and to make distributions to UDF III investors.

68. UDF III investors would have considered it important in buying units in the Secondary DRIP the true source of a portion of their received distributions were not actually coming from funds from operations as disclosed in UDF III's filings with the SEC Commission, but instead were the result of transfers from UDF IV.

69. Defendants caused UDF III to enter into these transactions for their own benefit, including for the purpose of concealing losses facing UDF affiliated entities. Defendants shifted the risks and losses resulting from the failing UDF affiliated entities to UDF III through these transactions. The loans that UDF III provided to earlier UDF entities allowed these entities to make payments to creditors. Included among these creditors was UDF III itself which, for example, funded the UMT Loan through the UMT Participation

Interest and was thereby entitled to payments made by UDF I under the UMT Loan.  In other words, Defendants caused UDF III to lend to UDF I in part so that UDF I would have sufficient liquidity to make payments back to UDF III.

70.     These loans thereby permitted earlier affiliated entities to conceal their losses. Defendants also concealed and failed to recognize impaired loans or recognize losses by consistently failing to enforce payments and obligations due from borrowers, instead extending the maturity dates *ad nauseum* on loans to the developer borrowers and loans to other affiliated entities.

**D.     <u>UDF III Misrepresented The Nature Of Its Lending Business</u>**

71.     UDF III failed to disclose material adverse information concerning its lending practices in the SEC filings issued during the Class Period.  For example, UDF III's SEC filings do not disclose that land securing its loans may and has been undeveloped for several years and that the capital provided through its loans would not be used for real estate development purposes.  In the case of UDF III loans to Shahan Prairie, the real estate development loans have been issued by Defendant UDF I, and then UDF III, and then Defendant UDF V but after more than 10 years, there were no signs of material progress in development.

72.     Through the December 14, 2015 8-K filing, there were false and misleading statements concerning UDF III's investments about Shahan Prairie in UDF III's periodic SEC filing.  In the 2015 8-K, it was represented:

> Shahan Prairie illustrates the allocation of financing opportunities
> through the lifecycle of a single-family residential development,
> from land acquisition and development to the sale of finished lots
> to homebuilders.
>
> Shahan Prairie consists of approximately 102 acres of land in
> Denton County that is being developed into 402 single-family

detached lots.  The offsite roads, water and sewer for this project
are subject to a joint development agreement with an adjacent
property.  In 2004, United Development Funding, L.P. ("UDF I")
originated a loan to fund the land acquisition.  At that time, the
owners of Shahan Prairie and the owners of the adjacent property
were working jointly on development agreements and contracts to
bring offsite roads, water and sewer to both properties.

Upon completion of these agreements, the borrower sought
additional financing to fund the commencement of the
development in 2007.  At this time, UDF I had completed its
capital raising activities and its capital was fully invested.  In
accordance with the participation agreement between the UDF
funds, UDF III originated a subordinated development loan in
2007 to the borrower to fund excavation on 211 of the 402 planned
lots.  UDF I was repaid by the borrower at this time and the UDF I
collateral was released. Mass grading was completed and a plat for
these 211 lots was prepared.

After this point, the adjacent property underwent several
ownership changes over the next few years, which delayed the
completion of the offsite improvements.  The owner of Shahan
Prairie continued to add value to the property by obtaining
enhancements to the entitlements associated with the 102 acres.

Upon completion of the off-site improvements, the borrower
sought financing for the completion of the development.  At this
time, UDF III had completed its capital raising activities and its
capital was fully invested. In accordance with the allocation policy
agreement between the UDF funds, UDF V provided a
subordinated development loan in June 2015 to the borrower for
the completion of 402 lots.  As a result, the borrower repaid the
UDF III loan and the UDF III lien was released.

All 402 lots in Shahan Prairie are currently under option contracts
to two builders - a national homebuilder and a large regional
homebuilder.

73.     The Defendants' explanation as to why successive affiliated entities have multi-

million dollar real estate development loans over a 12 year period to an entity that has caused no

development of the property does not make sense.  The Defendants have concealed that Shahan

23

Prairie is simply a vehicle for which the borrowers affiliate has received loan proceeds originating from UDF III from which to pay that affiliates other creditors.

74.     In addition, UDP III's lending to Defendant UDP I's wholly-owned subsidiaries included a loan to Northpointe LLC ("Northpointe") that was originated in December 2008 with a commitment amount of $4.2 million (the "Northpointe Loan"). The Northpointe Loan was initially collateralized by a first lien deed of trust on 303 finished lots in Texas and assignments of distributions from Northpointe LLC. In December 2008, Northpointe was purchased by an unrelated third party that assumed the Northpointe Loan. As of September 30, 2015, the Northpointe LLC Note was secured by a pledge of the equity interests in a borrower affiliate that owns 394 acres of *undeveloped land* in Denton County, Texas, effectively subordinating this pledge to all real property liens. The interest rate under the Northpointe LLC Note is 12%. The original maturity date of the Northpointe LLC Note was December 4, 2011. Defendants have extended the maturity date of the Northpointe LLC Note five times resulting in a current maturity date of June 4, 2016.

E.     **UDF III Failed To Disclose That Its Lending Practices Were In Violation Of The Partnership Agreement**

75.     In its annual reports, Defendants represented:

> Our investments in loans to or from any one borrower will not exceed an amount greater than 20% of the total capital contributions raised in the offering and as of December 31, 2012, our largest investment in loan to or from any one borrower is equal to 15% of the total contributions capital raised in the offering.

76.     The Partnership Agreement governing the relationship between UDF III, the General Partner and the limited partners who are class members and governs the operation of UDF III limits the amount of credit exposure of UDF III and the Limited Partners can extend to

24

borrowers in order to avoid, among other things (i) concentrated credit risks; (ii) amount of credit transactions with affiliates; and (iii) investments in unimproved real property. Specifically, Section 11.3(b) of the Partnership Agreement provides: "[t]he Partnership may not invest in or make mortgage loans to or from anyone borrower that would exceed, in the aggregate, an amount greater than 20% of the Offering proceeds."

77.     UDF III raised gross proceeds of approximately $410.4 million through its securities offerings, or approximately $370.8 million net of offering costs. The Partnership Agreement distinguishes between "Offering proceeds" and "gross Offering proceeds." It is clear that 20% limit is based upon "Offering proceeds" net of offering expenses. The 20% limit therefore contractually prohibits UDF III from lending more than approximately $74.2 million (20% of UDF III's net offering proceeds of $370.8 million) to any one borrower.

78.     Starting with its 10-K filing for 2011, UDF III has provided summary information concerning certain of its loans to Defendant UDF I and its affiliates, CTMGT and its affiliates, and Buffington Land and its affiliates. The loans to these entities are reported as percentages of the outstanding balance of "UDF III's portfolio." The term "UDF III's portfolio" is undefined, but appears to include notes receivable (net) and the Participating Interest, excluding other assets on the balance sheet including cash and cash equivalents, restricted cash, accounts receivable, accrued interest, and "other assets."

79.     UDF III falsely represented in its SEC filings during the period between 2012 and 2015 that UDF III had not exceeded the 20% Cap on Investments. A careful analysis of UDF III's SEC filings, however, reveals that UDF III has exceeded this limit with respect to its lending to UDF I between 2010 and 2014; that it has exceeded the limit with respect to its lending to CTMGT since at least 2011; and that it has exceeded the limit with respect to its lending to

25

Buffington Land and/or Lennar Buffington since 2014.

80.     UDF III's SEC filings have contained similar misstatements for the past several

years.  For example:

> Our investments in loans to or from anyone borrower will not
> exceed an amount greater than 20% of the total capital
> contributions  raised in the Offering, and as of December 31, 2014,
> our largest investment in a loan to or from anyone borrower was
> equal to 16% of the total capital contributions raised in the
> offering.  Our investments  in  loans  to or from anyone  borrower
> are calculated based on the aggregate amount of capital
> contributions raised in the Offering actually used to make or invest
> in loans with such borrower.  (2014 Form 10-K.);

> Our investments in loans to or from anyone borrower will not
> exceed an amount greater than 20% of the total capital
> contributions raised in the Offering, and as of December 31, 2013,
> our largest investment in a loan to or from anyone  borrower was
> equal to 16% of the total capital contributions raised in the
> offering.  Our investments in loans  to or from anyone borrower
> are calculated based on the aggregate  amount of capital
> contributions raised in the Offering actually used to make or invest
> in loans with such borrower.  (2013 Form 10-K.);

> Our investments in loans to or from anyone borrower will not
> exceed an amount greater than 20% of the total capital
> contributions raised in the Offering, and as of December 31, 2012,
> our largest investment in a loan to or from anyone borrower  is
> equal to 15% of the total capital contributions  raised  in the
> offering.  Our investments in loans to or from anyone borrower are
> calculated based on the aggregate amount of capital contributions
> raised in the Offering actually used to make or invest in loans with
> such borrower.  (2012 Form 10-K.); and

> Loans to or from anyone borrower will not exceed an amount
> greater than 20% of the total capital contributions raised in the
> Offering, and as of December 31, 2011, our largest loan to or from
> anyone borrower is equal to 20% of the total capital contributions
> raised in the Offering. (2011 Form 10-K.)

81.     As of December 31, 2010, UDF III's lending to Defendant UDF I and its affiliates

included the UMT Participation Interest balance of approximately $57.8 million; the UDF I Loan

26

balance of approximately $11.1 million; the UDF NP Loan balance of approximately $10.1

million; the UDF PM Loan balance of approximately $8.7 million; and the OU Land Loan

balance of approximately $2.8 million.  UDF III's total balance of loans due from Defendant

UDF I and its affiliates was approximately $90.5 million, well in excess of the 20% limit of

approximately $74.2 million.

82.     As of December 31, 2011, UDF III's lending to UDF I and its affiliates included

the UMT Participation  Interest balance of approximately $66.2 million; the UDF I Loan balance

of approximately $12.6 million; the UDF NP Loan balance of approximately $11.6 million; and

the UDF PM Loan balance of approximately $4.2 million.  UDF III's total balance of loans due

from Defendant UDF I and its affiliates was approximately $94.6 million, well in excess of the

20% limit of approximately $74.2 million.

83.     UDF III's 2011 10-K filing states that loans to CTMGT and affiliates represented

29% and 13% of the outstanding portfolio balance respectively.  Based upon these

representations, it appears that the 20% limit with respect to the loans to CTMGT was exceeded

before December 2011.

84.     As of December 31, 2012, UDF III's lending to UDP I and its affiliates included

the UMT Participation Interest balance of approximately $75.2 million; the UDP I Loan balance

of $12.9 million; and the UDP NP Loan balance of approximately $13.4 million.  UDF III's total

balance of loans due from UDF I and its affiliates was approximately $101.5 million, well in

excess of the 20% limit of approximately $74.2 million.

85.     As of December 31, 2013, UDF III's lending to UDF I and its affiliates included

the UMT Participation Interest balance of approximately $70.8 million; and the UDP NP Loan

balance of approximately $9.1 million.  UDP III's total balance of loans due from UDP I and its

affiliates was approximately $79.9 million, well in excess of the 20% limit of approximately $74.2 million.

86.     As of December 31, 2014, UDF III's lending to UDP I included the UMT Participation Interest balance of $74.6 million, in excess of the 20% limit of approximately $74.2 million.

87.     In 2014, UDF III was under investigation by the SEC but failed to disclose this information to unitholders.

88.     In its Form 10-Q for the period ended September 30, 2015 ("2015 3d Q Form 10-Q") the Defendants misleadingly stated that UDF III "may invest in multiple secured loans that share a common borrower" [Pages 35, 49].  The Defendants falsely certified that:  (a) UDF Ill's "investments in loans to or from anyone borrower will not exceed an amount greater than 20% of the total capital contributions raised in the Offering"; and (b) "as of September 30, 2015, our largest investment in a loan to or from anyone borrower was equal to 7% of the total capital contributions raised in the Offering."

89.     UDF III's lending to Defendant UDF I, through the UMT Loan and through its lending to wholly-owned affiliates, continuously exceeded the $74.2 million limit between 2010 and 2014.

90.     The Partnership Agreement requires that loans, and particularly transactions with Defendant Land Development and its Affiliates, must be supported by independent appraisals. In this regard, Section 11.3(c) of the Partnership Agreement provides:

>     "(c) All mortgage loans must be supported by an appraisal of the
>     property which secures the loan, which shall be prepared by a
>     Competent Independent Expert.[2]  The appraisal shall be

---

[2]     Section 3.17 defines "*Competent Independent Expert*" as "a Person with no material current or prior business or personal relationship with the Sponsor who is engaged to a substantial extent in the business of

maintained in the Partnership's records for at least five (5) years and shall be available for inspection and duplication by any Limited Partner. . . ."

91.     And, Section 13.3 of the Partnership Agreement provides:

13.3    *Loans*.  No loans may be made by the Partnership to the General Partners or its Affiliates except in compliance with the terms of this Section 13.3.

(a)    The Partnership may provide mortgage loans to Affiliates of the General Partner only if such mortgage loans meet the following conditions:

(i)    Loans may be made to Affiliates of the General Partner in connection with transactions in which the General Partner or its Affiliate is participating in a joint venture with a developer or homebuilder to facilitate a FASB Interpretation No. 46 compliant structure.  Any such loan must include all of the following terms:  (a) the loan must be secured by a first of junior lien on residential real estate (or real estate to be developed into residential real estate), (b) the loan amount, inclusive of all indebtedness provided by the Partnership, shall not exceed 80% of the appraised value of the property securing the indebtedness, (c) the Affiliate of the General Partner may not own directly or indirectly more than 50% of the borrowing entity, (d) the borrowing entity provides a minimum equity contribution of not less than 20% of the property acquisition price, (e) the rate of interest shall not be less than the highest rate charged by the Partnership to unaffiliated borrowers, and (f) the loan shall provide recourse to the borrower of not less than 100% of the loan amount; or

(ii)    An Independent Advisor issues an opinion to the effect that the proposed loan to an Affiliate of the General Partners is fair and at least as favorable to the Partnership as a loan to an unaffiliated borrower in similar circumstances.  In addition, the General Partner will be required to obtain a letter of opinion from the Independent Adviser in connection with any disposition, renegotiation, or other subsequent transaction involving loans made to the General Partners or an Affiliate of the General Partner. The Independent Adviser must be identified in the initial Prospectus.  The Independent Adviser's compensation must be

---

rendering opinions regarding the value of assets of the type held by the Partnership and who is qualified to perform such work."

paid by the General Partner and not be reimbursable by the
Partnership.

     (b)    Loans made to third parties, the proceeds of which
are used to purchase or refinance a property or other asset in which
the General Partner or an Affiliate has an equity or security
interest, must meet the requirements of subparagraph (a)(i) or
(a)(iii) of this Section 13.3.

92.    Defendant Land Development failed to cause UDF III to obtain the required
appraisals of the properties and collateral supporting the UMT Loan.  Even in April 2015, when
UDF III exercised its Option to take the direct interest in the UMT Loan with Defendant UDF I,
UDF III did not to obtain any appraisals of the collateral or other assurances that the loan was
properly secured.

    **F.**    **UDF III Omitted Disclosing The Impaired Loans It Was
Carrying At Full Value To Prop Up UDF III's Financial Profile**

93.    UDF III was required to file financial statements with the SEC that complied with
Generally Accepted Accounting Principles ("GAAP").  Among other things, this meant that
UDF III had to disclose certain information about the loans it had made to developers and inform
investors if any significant outstanding loans became "impaired"—*i.e.,* UDF III believed it was
unlikely to be able to collect on the loan.

94.    Generally Accepted Accounting Principles ("GAAP") required UDF III to report
if any of its significant outstanding loans became "impaired"—meaning UDF III believed it was
unlikely to fully collect on the loan.  Although UDF III's financial statements reflected general
reserves, UDF III took no specific impairment on loans and told investors that full collectability
was probable.  But its loans to cash-strapped affiliates such as UDF I, UDFX, Inc., UDF III.

30

95.     UDF III's December 14, 2015 8-K also contains the false general representation that UDF III's "business model is sound."  This representation further conceals Defendants' scheme.

96.     Among UDP III's loans to UDF I was a promissory note that was originated in December 2006 in the principal amount of approximately $6.3 million and bearing interest at a rate of 12%.  This loan (the "2006 UDF I Loan") was modified to $8.1 million in December 2008, to $12.8 million in June 2011, and to $15.6 million in June 2012.  UDF III's SEC filings do not indicate the exact balances of the 2006 UDP I Loan prior to 2010. Between 2010 and 2012, the balance of the UDF I Loan, as recorded in UDF III's financial statements, increased as follows: $11.1 million as of December 31, 2010; $12.6 million as of December 31, 2011; and $12.9 million as of December 31, 2012.  Defendants caused UDF III to extend the 2006 UDF I Loans on five occasions.  UDF I never repaid the loan to UDF III.  Instead, in October 2013, Defendants caused UDF I to assign UDF III a promissory note payable by an unrelated party in exchange for the cancelation of the 2006 UDF I Loan.  The identity of this unrelated party, and the status of the promissory note that UDF III received from UDF I, cannot be determined from UDF III's SEC filings.

97.     In December 2007, UDF III originated a secured loan (the "CTMGT Loan") to CTMGT and its subsidiaries, which are Centurion American entities under common control of one individual.  The CTMGT Loan commitment was originally $25 million, and was subsequently increased to $50 million in July 2008, to $64.5 million in November 2011, to $65.7 million in December 2014 and to $112.9 million in July 2015.

98.     The CTMGT Loan is a co-investment loan secured by multiple investments including current and future-acquired assets.  These investments are cross-collateralized and are

31

secured by collateral-sharing arrangements in subordinate liens covering finished lots and entitled land, pledges of the ownership interests in the borrowing entities, and guarantees. *The collateral-sharing arrangements allocate the proceeds of the co-investment collateral between UNF III and UDF I.*

99.     Effective July 1, 2015, the Defendants caused UDF III to enter an agreement with CTMGT that modified the collateral-sharing arrangements with UDF I pursuant to the CTMGT Loan. This modification agreement permitted UDF III "at its option" to defer some or all of its 75% payment preference from time to time in order that CTMGT and its subsidiaries may pay UDF I.

100.    The Defendants have caused UDF III to conceal Defendant UMT's financial condition. UDF III's SEC filings neither contain any disclosure, similar to the disclosure in UMT's 10-K filing for the 2007, that the UMT Loan would likely be unrecoverable if the financial crisis did not deepen, nor do these filings contain any disclosures that UDF I's ability to repay the loan is contingent upon its receipt of additional loans. UDF III invested more than $70 million in the UMT Participation Interest in the UMT Loan, and would extend several additional loans to Defendant UDF I, its subsidiaries and joint ventures. In addition, Defendants have caused UDF III to conceal that the UMT Participation Interest is unrecoverable.

101.    Defendants concealed the "minority limited partnership interest" held by UMTHLD in Buffington Homebuilding Group, Ltd. a Buffington Land affiliate and described it instead as a "third party borrower." During the class period, UDF III had 27 loans outstanding to Buffington Land.

102.    It was not until its 2012 financial reports that UDF III began to report its loans to Buffington Land and Centurion as a percentage of UDF III's loan portfolio.

32

103.     Moreover, although Buffington Land affiliate Lennar Buffington was the borrower on $106.6 million of loans from UDF III the affiliate was never identified until late 2015 when UDF III filed an involuntary bankruptcy proceeding against Lennar Buffington.

104.     UDF III's loans to Buffington Land and Lennar Buffington have been impaired for years but UDF III did not even disclose any impairment expense or reserve on its financial statement.

105.     The Defendants have concealed the financial condition of Buffington Land and its affiliates.  The documents filed in Lennar Buffington's bankruptcy proceeding indicate that it has only $8 million in assets and $143 in liabilities and that UDF III's loan balance to the entity is $106.5 million.  It is evident from these disclosures that UDF III's loan to Lennar Buffington is unrecoverable and that Buffington Land is insolvent.  UDF III has never recorded any impairment on this loan nor has it ever disclosed that Lennar Buffington and Buffington Land are insolvent.

106.     In order to conceal massive losses that UDF III was facing, the Defendants caused UDF III to provide false and misleading information concerning the financial condition of Buffington unidentified debtor referenced in its press release of December  14, 2015, Lennar Buffington Stonewall Ranch, LP ("Lennar Buffington"), an affiliate of Buffington Land.  The Defendants likewise caused UDF III to misrepresent UDF III's exposure to Lennar Buffington. Documents filed in connection with the Lennar Buffington bankruptcy proceeding reveal *$106.5 million* in loans made by UDF III to Lennar Buffington that will not be repaid, as well as the following:

(a)     Not only is UDF III's loan to Lennar Buffington approximately *$106.5 million* but the balance of UDF I's loan to Lennar Buffington is *$30,750,225.*

33

(b)     The proposed "Joint Plan of Reorganization," signed by Defendant Greenlaw on behalf of UDF I and UDF III, indicates that the land in which Defendants caused UDF III to invest, on which *no development* has occurred, had been posted for foreclosure as of November 30, 2015 by PNC Bank (which loaned Lennar Buffington $35 million).  The property is proposed to be acquired for $16 *million.*

(c)     Lennar Buffington has no ability to satisfy its loans to UDF III.

(d)     Pursuant to the proposed Joint Plan of Reorganization, Defendants propose to prioritize payment to UDF over any payment to UDF III.

(e)     UDF III's loans to Lennar Buffington have been impaired for several years but the Defendants concealed the impairment and never caused UDF III to record any impairment expense on these assets.  UDF III will now be forced to record impairments on its loans to Buffington Land and its affiliates including Lennar Buffington.

(f)     Because UDF I has suffered substantial losses through its investment in Lennar Buffington, the ability of UDF I to fulfill its obligation to UDF III resulting from the $71.2 million UMT Participation Interest has been negatively impaired.

107.    Lennar Buffington was not the only impaired, undisclosed loan.  In its 2012 Form 10-K, filed on March 31, 2013, UDF III identified several loans totaling $111,749,000 that had matured but had not been repaid or extended as of December 31, 2012 and impaired eight of those loans.  The largest of these loans, which was not impaired as the note was amended during March 2013, was a 2008 loan to an Austin-based developer (the "Austin Borrower") that reflected an outstanding principal balance of $76,999,000.  The 2013 10-K, filed on March 31, 2014 disclosed that the loan to the Austin Borrower was extended in March 2013 to a new maturity date of March 31, 2014, and increased to a new commitment amount of approximately

$85 million.  The disclosures further stated that full collectability for this loan was considered

probable.  But, UDF knew or should have known that full collectability from the Austin

Borrower was not probable and, at best, highly uncertain.

108.    In early March 2014, UDF's outside auditors met with UDF in connection with

the 2013 audit to discuss any impairment issues related to UDF's loans.  The outside auditors

requested cash flow (*i.e.,* collectability) projections for selected loans, including the loan to the

Austin Borrower.  UDF had previously requested the Austin Borrower to prepare a cash flow

projection (the "Borrower Projection") for its loan, which the Austin Borrower sent to UDF on

March 18, 2014.  The Borrower Projection showed an ever-increasing loan balance and that

Austin Borrower would be unable to repay the loan with cash from current projects.  UDF

created its own cash flow projection (the "UDF Projection") that used different assumptions and

included the addition of eleven new projects that were projected to provide the Austin Borrower

additional cash flow to pay off the loan.  But the Austin Borrower had not vetted or agreed to

undertake these eleven new projects.  The UDF Projection showed the Austin Borrower paying

off the loan in full.  The UDF Projection also used undiscounted cash flows.  GAAP requires a

company like UDF to measure impairment based on the present value of expected future cash

flows discounted at the loan's effective interest rate.  On March 25, 2014, UDF advised its

auditors that it had completed its cash flow analysis and sent them the UDF Projection without

providing the Borrower Projection or the nature of the assumptions UDF used.

109.    UDF III violated GAAP because it recognized no specific impairment on its loan

to the Austin Borrower in UDF III's 2013 Form 10-K filed on March 31, 2014, and in all

subsequent periodic reports.  Had UDF III properly complied with applicable GAAP, it would

have recognized a specific loan loss allowance in addition to its general reserve balance and put

the loan on non-accrual status with suspended income recognition at least as early as UDF III's

2013 Form 10-K.  Impairment of the loan to the Austin Borrower was material to investors

because it affected the status of the loan for UDF III's second-largest borrower.

110.   Thereafter, UDF and the Austin Borrower engaged in protracted negotiations to

unwind the failing relationship.  Ultimately, UDF was unable to consummate the transfer of the

Austin Borrower's loan portfolio to another developer.  On January 6, 2017, UDF III filed a

Form 8-K announcing certain agreements involving the Austin Borrower, including UDF III's

forgiveness of more than $122 million of indebtedness.

### G.   UDF III's Financial Problems Began To Be Revealed

111.   In 2014, UDF III was being investigated by the SEC.  However, UDF III's 2014

annual report on Form 10-K, issued March 31, 2015, signed by Defendants Etter, Obert and

Greenlaw, failed to disclose the SEC investigation of UDF III and UDF IV.

112.   In February 2016, information began to emerge about UDF generally, although

there was nothing specific as to UDF III to alert UDF III stock buyers of UDF III's

misrepresentations.  In February 2016, a search warrant issued by a Magistrate Judge of the

United District Court for the Northern District of Texas, allowed the FBI to search the UDF

offices and seize records and computer hard drives.  Also in February 2016 the FBI served grand

jury subpoenas to several UDF principals, seeking the production of documents related to UDF's

operations.

113.   In a March 23, 2016 letter to investors, UDF III suspended distribution payments

and stated UDF III "feels it is prudent for UDF III to preserve cash as we continue to work with

UDF III's borrowers to determine their capital requirements."

114.     Corroborating the Ponzi-like scheme later disclosed by the SEC, UDF III's suspension of distributions was preceded (March 4, 2016) by UDF IV's default on a $28.5 million loan.  UDF IV entered into a forbearance agreement with that lender which prohibited UDF IV from (i) originating new mortgages; (ii) incurring additional debt; (iii) granting new substitute collateral to any other lenders; or (iv) dispose of any assets.

115.     On March 23, 2016, UDF III wrote to its investors to say that it was suspending its cash distributions to preserve capital.

116.     The dividend suspension came as a total shock in light of the fact that as of November 16, 2015, UDF III in its quarterly report on Form 10-Q for the quarter ended September 30, 2015 reported $319 million in total assets and only $19 million of total liabilities.

117.     Finally in July 3, 2018, the truth was disclosed specifically about UDF III when the SEC announced charges against UDF III and Defendants herein Greenlaw, Wissink, Etter, Obert and Hanson of misleading investor by failing to disclose the UDF III "could not pay its distributions and was using money from a newer fund to pay UDF III investors.  Defendants Greenlaw, Wissink, Etter and Obert agreed to pay $8.2 million in disgorgement, interest and penalties and consented to entry of final judgment of permanent injunctions.

**H.     The Roles Of Greenlaw, Etter, Wissink And Obert**

118.     Greenlaw and Obert signed every UDF III and UDF IV Forms 10-K and 10-Q filed with the Commission during the Relevant Period, and Etter signed every UDF III Form 10-K filed with the Commission during the Relevant Period.  Greenlaw and Obert also, as required under Section 302 of the Sarbanes-Oxley Act, certified each of UDF III's and UDF IV's periodic filings during the Relevant Period.  In addition, Greenlaw and Obert signed several UDF IV

registration statements and amendments thereto filed with the Commission during the Relevant Period and through which UDF IV offered and sold securities.

119.    Throughout the Class Period, Greenlaw, Etter, and Wissink were the only three voting members of UDF's Investment Committee, which made all of the investment, loan underwriting and impairment decisions for UDF III and IV.  Obert was a regular attendee of and participant in the Investment Committee meetings and knew the nature and status of these decisions.  Greenlaw, Etter, Wissink, and Obert each knew, or should have known, about the transactions between UDF IV and UDF III giving rise to the distributions at issue, the payment of the distributions to UDF III investors using UDF IV funds, the collectability of UDF III's loan to the Austin Borrower, and UDF IV's loans to purchase unimproved real property.

120.    As a result, Greenlaw, Obert, Wissink, and Etter knew, or should have known, that the disclosures and statements discussed above were false and misleading.  UDF IV's capital raising activities also provided a portion of the fees paid to the funds' advisor.  Greenlaw, Etter, Obert, and Wissink collectively received millions of dollars in compensation from the advisor during the Relevant Period in the form of distributions, guaranteed payments, salary, dividends, and miscellaneous income.

**The Role Of Defendant Whitley Penn**

121.    Whitley Penn was, for years, fully immersed in every aspect of the Fiduciary Defendants' violations of both fiduciary duties to UDF III and contractual obligations. Nevertheless, Whitley Penn stood by and idly permitted the conduct to persist without question.

122.    In each of UDF III annual reports for the years ended 2011, 2012, 2013 and 2014, Defendant Whitley Penn represented:

In our opinion, the financial statements referred to above present

38

> fairly in all material respects, the financial position of United
> Development Funding III . . . . and the results of its operations and
> its cash flows . . . in conformity with accounting principles
> generally accepted in the United States of America.

123.    The PCAOB has recently identified deficiencies in Whitley Penn's audits.

PCAOB is a nonprofit corporation established by Congress to protect investors and the public

interest by promoting informative, accurate, and independent audit reports and to oversee the

audits of public companies and broker-dealers.  *See,* http://pcaobus.org/Pages/default.aspx.  The

PCAOB establishes auditing standards for registered public accounting firms to follow when

preparing and issuing audit reports, and it inspects such firms to assess compliance with SOX,

PCAOB rules, SEC rules, and professional standards.  PCAOB's standards clearly define the

responsibilities of an independent auditor to evaluate the aspects of an entity's operations that

could support a misstatement or prevent detection of information that has or could cause a

misstatement.  Risk and fraud detection and prevention are integral components of the PCAOB

standards.

124.    Whitley Penn has been the subject of five PCAOB inspections with reports issued

on March 14, 2007, December 22, 2008, September 2, 2009, December 5, 2011 and October 29,

2015.  The October 29, 2015 Inspection Report ("Inspection Report") was issued just days prior

to Whitley Penn's resignation as auditor of the affiliated entities.  *See,*

https://pcaobus.org/Inspections/Reports/Documents/2014-Whitley-Penn.pdf.  The  Inspection

Report identifies deficiencies of Whitley Penn and its audits, including but not limited to:

a.      "One of the deficiencies identified was of such significance that it

appeared to the inspection team that the Firm, at the time it issued its audit report, had not

obtained sufficient appropriate audit evidence to support its opinion that the financial statements

39

were presented fairly, in all material respects, in accordance with the applicable financial reporting framework.  In other words, in this audit, the auditor issued an opinion without satisfying its fundamental obligation to obtain reasonable assurance about whether the financial statements were free of material misstatement." Page 3-4 of the Inspection Report.

b.       "Whether or not associated with a disclosed financial reporting misstatement, an auditor's failure to obtain the reasonable assurance that the auditor is required to obtain is a serious matter.  It is a failure to accomplish the essential purpose of the audit, and it means that, based on the audit work performed, the audit opinion should not have been issued." Page 4 of the Inspection Report.

c.        "Issuer A- the failure to perform sufficient procedures to test the occurrence and valuation of revenue, including the use of sampling with an inadequate sample size developed without consideration of appropriate factors and the inadequate performance of substantive analytical  procedures ..."  Page 4 of the Inspection Report.

d.       The deficiency described above could relate to several applicable provisions of the standards that govern the conduct of audits, including.... [the] audit deficiencies involve a lack of due professional care..... [which] requires the independent auditor to plan and perform his or her work with due professional care and sets forth aspects of that requirement ... [including] the exercise of professional skepticism.  These standards state that professional skepticism is an attitude that includes a questioning mind and a critical assessment of the appropriateness and sufficiency of audit evidence.  Sufficiency is the measure of the quantity of audit evidence, and the quantity needed is affected by the risk of material misstatement (in the audit of financial statements) and the quality of the audit evidence obtained.  The appropriateness

of evidence is measured by its quality; to be appropriate, evidence must be both relevant and

reliable in support of the related conclusions." Page 4-5 of the Inspection Report.

## Count I

**Texas Securities Act, Tex, Rev. Civ. Art. 581-33-A**
**Fraudulent Sale**
**(Against Defendant UDF III)**

125.   Plaintiff repeats and realleges the foregoing paragraphs as if stated in full.

126.   The Texas Securities Act ("TSA"), Tex. Rev. Stat. Art. 581-33-A, provides, in

pertinent part:

> A. *Liability of Sellers. (A)(2) Untruth or Omission.* A person who
> offers or sells a security (whether or not the security or transaction
> is exempt under Section 5 or 6 of this Act) by means of an untrue
> statement of a material  fact or an omission to state a material fact
> necessary in order to make the statements made, in the light of the
> circumstances  under which they are made, not misleading, is
> liable to the person buying the security from him, who may sue
> either at law or in equity for rescission, or for damages if the buyer
> no longer owns the security.

127.   As alleged herein, UDF III offered or sold securities to Plaintiff and the proposed

class by means of untrue statements of material fact and by its omission to state material facts

necessary in order to make the statements made, in the light of the circumstances under which

they were made, not misleading.

## Count II

**Texas Securities Act, Tex. Rev. Civ. Art. 581-33-F(l)**
**Control Person Liability**
**(Against All UDF Defendants Except UDF III)**

128.   Plaintiff repeats and realleges the foregoing paragraphs as if stated in full.

129.   The TSA, Tex. Rev. Stat. Art. 581-33-F(1), provides, in pertinent part:

**F. Liability of Control Persons and Aiders.**

41

(1) A person who directly or indirectly controls a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer, unless the controlling person sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

130.    A person is liable as a "control person" where he or she has the possession, direct or indirect, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Depending on the circumstances, a control person might include an employer, an officer or director, a large shareholder, a parent company, and a management company.

131.    As alleged herein, UDF III offered or sold securities to Plaintiff and the proposed classes by means of untrue statements of material fact and by its omission to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

132.    The UDF Individual Defendants were all officers and directors of UDF III and each directly or indirectly possessed the power to direct or cause the direction of the management or policies of UDF III.  In that capacity, the UDF Individual Defendants directed and controlled UDF III's misconduct and knew or should have known of such misconduct.

133.    The UDF Individual Defendants are jointly and severally liable with UDF III for UDF III's violation of TSA.

## Count III

### Texas Securities Act, Tex. Rev. Civ. Art. 581-33-F(2) Materially Aiding Violations Of The Texas Securities Act Art. 581-33(A)(2) (Against All Defendants Except UDF III)

134.    Plaintiff repeats and realleges the foregoing paragraphs as if stated in full.

135.    The TSA, Tex. Rev. Civ. Art. 581-33-F(2), provides, in pertinent part:

> F.  Liability of Control Persons and Aiders.
> (2) A person who directly or indirectly with intent to deceive or
> defraud or with reckless disregard for the truth or the law
> materially aids a seller, buyer, or issuer of a security is liable under
> Section 33A, 33B, or 33C jointly and severally with the seller,
> buyer, or issuer, and to the same extent as if he were the seller,
> buyer, or Issuer.

136.    To establish liability for aiding fraud under TSA, a plaintiff must demonstrate:

> (1) a primary violation of the securities laws occurred;

> (2) the alleged aider had "general awareness" of its role in this
> violation;

> (3) the actor rendered "substantial  assistance" in this violation;
> and

> (4) that the alleged aider either (a) intended to deceive the plaintiff
> or (b) acted with reckless disregard for the truth of the
> representations made by the primary violator.

137.    An aider may be held liable where it rendered assistance "in the face of a perceived risk" and must possess "a general awareness that his role was part of an overall activity that is improper."

138.    As alleged herein, UDF III committed primary violations by offering or selling securities to Plaintiff and the proposed classes by means of untrue statements of material fact and by their omission to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

139.     UDF Defendants (other than UDF III) had an identical mental state as the UDF Individual Defendants, who served individually and collectively as the equity owners, trustees, directors, officers and executives of these Defendants.

140.     UDF Defendants (other than UDF III) intentionally and/or recklessly disregarded numerous red flags indicating that UDF III's Class Period financial statements were materially false and misleading, and that UDF III's offerings were therefore made in violation of TSA.

141.     UDF Defendants provided substantial assistance to UDF III by structuring loans and obligations that concealed UDF III's financial condition and operations as set forth herein.

142.     All Defendants named in this Count are jointly and severally liable with UDF III's violation of TSA.

143.     The misconduct of the Defendants named in this Count was the proximate cause of the Class Members' losses, because they directly and proximately resulted in the Class Members' investments in UDF III.

144.     As a direct and proximate consequence of the misconduct of the Defendants named in this Count as described above and throughout this Complaint, Plaintiff and the Class Members have lost a substantial portion of the money they invested in UDF III, in an amount to be determined at trial but well in excess of $5,000,000.

### **Count IV**

**Texas Securities Act, Tex. Rev. Civ. Art. 581-33-F(2)**
**Materially Aiding Violations of the Texas Securities Act Art. 581-33(A)(2)**
**(Against Whitley Penn)**

145.     Plaintiff repeats and realleges the foregoing paragraphs  as if stated in full.

146.    The TSA, Tex. Rev. Civ. Art. 581-33-F(2), provides, in pertinent part:

> F.  Liability of Control Persons and Aiders.
> (2) A person who directly or indirectly with intent to deceive or
> defraud or with reckless disregard for the truth or the law
> materially aids a seller, buyer, or issuer of a security is liable under
> Section 33A, 33B, or 33C jointly and severally with the seller,
> buyer, or issuer, and to the same extent as if he were the seller,
> buyer, or issuer.

147.    To establish liability for aiding fraud under TSA, a plaintiff must demonstrate:

(1)    a primary violation of the securities laws occurred;

(2)    the alleged aider had "general awareness"  of its role in this
violation;

(3)    the actor rendered "substantial assistance"  in this violation;
and

(4)    that the alleged aider either (a) intended to deceive the
plaintiff or (b) acted with reckless disregard for the truth of
the representations  made by the primary violator.

148.    An aider may be held liable where it rendered assistance "in the face of a
perceived risk" and must possess "a general awareness that his role was part of an overall activity
that is improper."

149.    As alleged herein, UDF III committed primary violations  by offering or selling
securities to Plaintiff and the proposed classes by means of untrue statements of material fact and
by their omission to state material facts necessary in order to make the statements made, in the
light of the circumstances under which they were made, not misleading.

150.    As the independent auditor for UDF III and numerous of their affiliates, Whitley
Penn recklessly or knowingly participated in the UDF Defendants' scheme, as discussed *supra,*
while being aware that UDF III's Class Period financial statements were materially false and
misleading and that UDF III's offerings were therefore made in violation of TSA.

45

151.     Whitley Penn provided substantial assistance to UDF III and their co-defendants because its "clean audit" opinions were necessary for UDF IV, UDF V and their co-defendants to proceed with the Class Period offerings.  Furthermore, by signing off on the company's financial statements in the face of perceived risks knowing that its assistance would facilitate (validate) the untruthful and illegal Ponzi-like activity, Whitley Penn materially aided the UDF Defendants.

152.     Whitley Penn is jointly and severally liable with UDF III for UDF III's violation of TSA.

153.     Whitley Penn's misconduct was the proximate cause of the Class Members' losses, because they directly and proximately resulted in the Class Members' investments in the Secondary DRIP of UDF III.

154.     As a direct and proximate consequence of Whitley Penn's misconduct as described above and throughout this Complaint, Plaintiff and the Class Members have lost a substantial portion of the money they invested in the Secondary DRIP of UDF III in an amount to be determined at trial but well in excess of $5,000,000.

## Count V

### Negligence
### (Defendant Whitley Penn)

155.     Plaintiff repeats and realleges the foregoing paragraphs as if stated in full.

156.     In its capacity as independent public accountant for UDF III during the Class Periods, Defendant Whitley Penn had a duty to Plaintiff and the Proposed Classes to conduct  its annual audits of UDF III according to applicable professional  standards for an independent public accountant.

157.    To establish the applicable standard of care for an independent public accountant under the circumstances, the Court may examine professional standards of conduct in the public accounting industry.

158.    Defendant Whitley Penn owed Plaintiff and the Proposed Classes the duty to act as a reasonable independent public accountant would do under the same or similar circumstances.  The duties set forth herein arise from the auditing and accounting standards of the accounting industry, including generally accepted audit standards and generally accepted accounting principles.

159.    Defendant Whitley Penn negligently breached its duties to Plaintiff and the Proposed Classes by, *inter alia:*

        a.      failing to design and perform its annual audits of UDF III in accordance with GAAS, prior to issuing opinions those UDF III's financial statements were prepared in conformity with GAAP.

        b.      failing to warn Plaintiff and the Proposed Classes those UDF III's financial statements were materially false and misleading.

160.    Whitley Penn's  negligence was the proximate cause of injury to Plaintiff and the Proposed Classes.

161.    Plaintiff and the Proposed Class suffered damages.

## COUNT VI

### (Against UDF III And UMTHLD For Breach Of Fiduciary Duties Owed By The Partnership And General Partner To Limited Partners)

162.    Plaintiff incorporates by reference and realleges each and every allegation contained set forth above, as though fully set forth herein.

47

163.    As alleged in detail herein, under the common law of Texas and partnership law of Delaware, fiduciary duties to UDF III unitholders to, among other things, deal honestly with unitholders in the sale of DRIP Units.

164.    The Defendants named herein breached these fiduciary duties by concealing and misrepresenting material facts to Plaintiff and the Class as set forth herein.

165.    As a direct and proximate result of these breaches of fiduciary duties, Plaintiff and Class members have sustained substantial damages.

<u>COUNT VII</u>

**(Against All For Defendants Except UDF III And UMTHLD Aiding And Abetting Breach Of Fiduciary Duties)**

166.    Plaintiff incorporates by reference and realleges each and every allegation contained set forth above, as though fully set forth herein.

167.    Each of the Defendants knowingly participated in breaches of fiduciary duty by UDF III and UMTHLD and thus are liable for aiding and abetting the fiduciary breaches alleged herein.

168.    As a direct and proximate result of these Defendants aiding and abetting of breaches of fiduciary duties, Plaintiff and the Class have sustained substantial damages.

**<u>PRAYER FOR RELIEF</u>**

**WHEREFORE**, Plaintiff, on her own behalf and on behalf of the Proposed Class, prays for judgment as follows:

(a)    Certifying this action as a class action pursuant  to Fed. R. Civ. Proc. Rule 23(b)(2) and/or (3);

(b)      Certifying Plaintiff as class representative and appointing the under-signed

counsel as class counsel;

(c)      Awarding rescission and/or rescissory damages against the UDF and all other

Defendants, in favor of Plaintiff and the members of the Proposed Class, including interest;

(d)      Awarding compensatory damages in favor of Plaintiff and the members of the

Proposed Class against all Defendants, including interest;

(e)      Awarding punitive damages in favor of Plaintiff and the members of the Proposed

Class against all Defendants;

(f)      Awarding Plaintiff her reasonable attorneys' fees and costs; and

(g)      Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury for all issues triable thereby.

Dated: November 21, 2018            **KENDALL LAW GROUP, PLLC**


                                    _/s/ Joe Kendall_
                                    JOE KENDALL
                                    State Bar No. 11260700
                                    jkendall@kendalllawgroup.com
                                    JAMIE J. MCKEY
                                    State Bar No. 24045262
                                    jmckey@kendalllawgroup.com
                                    3811 Turtle Creek Blvd., Suite 1450
                                    Dallas, Texas  75219
                                    Telephone: (214) 744-3000
                                    Facsimile:  (214) 744-3015

                                    **SQUITIERI & FEARON, LLP**
                                    LEE SQUITIERI
                                    32 East 57th Street
                                    12th Floor
                                    New York, New York 10022
                                    Telephone:  (212) 421-6492